# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**AMANDA PIERNER-LYTGE,**

   Plaintiff,

  v.                                                  Case No. 17-CV-1380

**PATRICK MITCHELL and**
**SCOTT POST,**

   Defendants.

---

## SUMMARY JUDGMENT DECISION UNDER RULE 56(f)

---

Amanda Pierner-Lytge brought this 42 U.S.C. § 1983 lawsuit against Patrick Mitchell and Scott Post in their official capacities as West Allis Chief of Police and City Attorney, respectively. (Docket # 1.) Pierner-Lytge alleges that, on several occasions, the defendants seized and retained her property under Wis. Stat. § 968.20(1m)(d) in violation of the Second, Fourth, and Eighth Amendments to the U.S. Constitution. (*Id.*)

The defendants filed no pretrial motions in this case. Pierner-Lytge moved for summary judgment and was denied. (Docket # 15, 26.) Trial was originally scheduled for June 10, 2019. On May 17, 2019, the parties submitted their joint pretrial report, proposed jury instructions and verdict form, and numerous motions *in limine*. (Docket # 29, 31, 32, 34, 36, 38, 39.) After reviewing these submissions, I held a conference with the parties at which I expressed concern about the lack of legal authority to support the plaintiff's claims. (Docket # 45.) I ordered the plaintiff to submit further legal authority supporting the constitutional claims or, if such authority was not available, explain why I should not *sua sponte* grant summary judgment for the defendants under Fed. R. Civ. P. 56(f). (*Id.*) I set a

briefing schedule, allowing the defendants to respond and the plaintiff to reply. (*Id.*) That briefing is now complete. (Docket # 46, 47, 48.)

The parties having been given notice and a full and fair opportunity to respond, I now conclude that judgment in favor of the defendants is appropriate as a matter of law for the reasons explained below.

## SUMMARY JUDGMENT STANDARD

In general, the court shall grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a

rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

Under Fed. R. Civ. P. 56(f), after giving notice and a reasonable time to respond, the court may grant summary judgment (1) for a nonmovant, (2) on grounds not raised by a party, or (3) on its own after identifying for the parties material facts that may not be genuinely in dispute. *See Osler Inst., Inc. v. Forde*, 333 F.3d 832, 836 (7th Cir. 2003) (a district court may grant summary judgment on its own motion, as long as the losing party is given notice and an opportunity to address the issues) (citing, *inter alia*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)); *Goldstein v. Fidelity & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750 (7th Cir. 1996) (district court may enter summary judgment even if no motion has been filed, but must not take the losing party by surprise in doing so) (citing *Hunger v. Leininger*, 15 F.3d 664 (7th Cir. 1994); *Choudhry v. Jenkins*, 559 F.2d 1085, 1089 (7th Cir. 1977)); *see also Schurr v. A.R. Siegler, Inc.*, 70 F. Supp. 2d 900, 911 n.6 (E.D. Wis. 1999) (court-supplied legal argument is appropriate basis for *sua sponte* summary judgment in favor of defendant).

## BACKGROUND[1]

Pierner-Lytge has been diagnosed as having bipolar disorder. (Defendants' Proposed Findings of Fact ("DPFOF"), Docket # 21 ¶ 1.) She has cut herself to relieve stress. (*Id.* ¶ 2.) At times, she has not taken her medication as prescribed for her bipolar disorder. (*Id.* ¶ 4.) Since at least 2016, she has had suicidal thoughts. (*Id.* ¶ 5.) She has made suicidal statements on social media in the past, resulting in her friends contacting law enforcement to check on her. (*Id.* ¶ 12.)

---

[1] These undisputed facts are taken from the parties' submissions on Pierner-Lytge's motion for summary judgment.

3

On May 3, 2016, West Allis police officers were dispatched to 915 South 111th Street in West Allis for a welfare check on Pierner-Lytge. (*Id.* ¶ 7.) Pierner-Lytge told officers that she had cut herself prior to the interaction with the officers. (*Id.* ¶ 8.) She told the officers that she was feeling suicidal, but that she did not have a plan to harm herself. (*Id.* ¶ 9.) She also told the officers that she had not taken her bipolar medication for two years. (*Id.* ¶ 11.) The West Allis Police transported her to the Dewey Center without incident. (*Id.* ¶ 10.)

On July 27, 2016, West Allis Police officers were contacted by Ryan Jarnagin and subsequently performed a welfare check on Pierner-Lytge. (*Id.* ¶ 13.) The officers noted several superficial lacerations to Pierner-Lytge's arm, which were self-inflicted. (*Id.* ¶ 14.) She informed the officers that she wanted to harm herself. (*Id.*) She stated that she had been sexually assaulted in June 2016, and fired from her job following the sexual assault. (*Id.*) She informed the officers that the Milwaukee County DA's office was not going to issue charges against the offenders in her sexual assault. (*Id.*) Pierner-Lytge voluntarily sought treatment from mental health professionals. (*Id.* ¶ 17.) West Allis Police officers conveyed her to Milwaukee County Mental Health facility without incident for an evaluation. (*Id.* ¶ 17.)

Also on July 27, 2016, Pierner-Lytge posted on her social media account: "Just got home from talking with the DA. Doesn't see the fear of force necessary to prosecute. Doesn't help the cop left out the part about dude threatening to corner me in a Porta potty either...So yea now I'm stuck. Having really strong urges to cut again. Doesn't feel like living either. It feels like rape charges are never brought about unless the victim gets beat up or killed." (*Id.* ¶ 16.) She also posted, "I can't cope anymore." (*Id.*)

On July 30, 2016, West Allis Police officers made contact with Pierner-Lytge in the parking lot of Greenfield Park. (*Id.* ¶ 18.) She informed the officers she was dealing poorly

4

with a traumatic incident. (*Id.*) She informed the officers that she was not suicidal, but she really needed mental health treatment. (*Id.*) She told the officers she would find it beneficial to go to inpatient counseling. (*Id.*) West Allis Police officer Steven Martin contacted mental health facilities in Milwaukee County and in Waukesha County to assist Pierner-Lytge in finding mental health support. (*Id.* ¶ 19.) None of the mental health facilities contacted would admit her if she was not suicidal. (*Id.*) Pierner-Lytge told West Allis Police that she would contact NAMI for assistance. (*Id.*) She then left Greenfield Park on her own, without needing police assistance. (*Id.* ¶ 20.)

On September 18 or 28, 2016,[2] West Allis Police officers were dispatched to the intersection of South 112th Street and West Walker Street, and encountered Pierner-Lytge, who told them that she was feeling depressed and had walked around her neighborhood for three hours in an attempt to collect herself. (*Id.* ¶ 21.) She told police that walking the neighborhood did not help her to collect herself, so she asked that they transport her to Milwaukee County Mental Health. (*Id.*)

West Allis Police officers searched Pierner-Lytge prior to transporting her to Milwaukee County Mental Health and found an electronic control device (taser) and a folding knife. (*Id.* ¶ 22.) The officers transported the items to the West Allis Police Department Control Room while Pierner-Lytge was at Milwaukee County Mental Health, because the facility would not allow those items. (*Id.*; Plaintiff's Proposed Findings of Fact ("PPFOF"), Docket # 17 ¶ 20.) The items were taken for safekeeping. (PPFOF ¶ 18.) West Allis Police officers transported Pierner-Lytge to Milwaukee County Mental Health upon her request.

---

[2] The Plaintiff's Proposed Findings of Fact ("PPFOF") (Docket # 17) says this incident occurred on September 18, while DPFOF says it occurred on September 28. Neither party disputes the other party's date. (PPFOF ¶ 18, DPFOF ¶ 21.)

(DPFOF ¶ 22.) The items were returned to her without a petition to the court, as they were not seized for a criminal charge or for evidence in any way. (PPFOF ¶ 19.)

    1.    *November 27, 2016 Incident*

On November 27, 2016, West Allis Police officers responded to the parking lot of the Target at 2600 South 108th Street, where Pierner-Lytge was located in her vehicle. (DPFOF ¶ 23.) The officers reported that she had several small cuts on her left forearm. (*Id.*) Officers asked her if she had been cutting herself, and she said yes. (*Id.* ¶ 24.) She told the officers that she cut herself because she was stressed out because of school and work and that cutting relieves the stress. (*Id.* ¶ 26.) She told the officers she had attempted suicide in the past, and that she took medication relating to her attempted suicides. (*Id.*) She stated she cut herself for stress relief and not for the purpose of attempting suicide. (*Id.* ¶ 27.) She stated she had no intention of harming herself and she did not wish to die. (*Id.*)

Officer Kendall observed a handgun in a cup holder of Pierner-Lytge's car and relayed that information to the other officer responding for officer safety. (PPFOF ¶ 21.) The West Allis Police officers removed Pierner-Lytge from her vehicle and patted her down. (DPFOF ¶ 25.) Pierner-Lytge complied with officer commands during this interaction. (PPFOF ¶ 22; Defendants' Response to PPFOF, Docket # 20 ¶ 22.) The officers asked Pierner-Lytge if she had any weapons in her vehicle and she responded that she had a Concealed Carry Permit and that there were weapons in the vehicle. (DPFOF ¶ 24.) The officers took possession of a firearm located in Pierner-Lytge's vehicle (in plain view next to the center console), described as a black Glock model 17, 9mm handgun, as well as a black Glock 9mm magazine with 16 Hornady 9mm Luger cartridges, a black clip-on nylon holster, a black Smith and Wesson knife, a camouflage folding knife, and a black pitbull stun-gun. (*Id.* ¶

29.) The officers removed all weapons from the vehicle. (PPFOF ¶ 23.) West Allis police took Pierner-Lytge's firearms and property for safekeeping. (DPFOF ¶ 30.) The weapons were not left in the vehicle because there was a possibility it could be broken into. (PPFOF ¶ 26.)

It is the policy of the West Allis Police Department to give any weapons belonging to patients to law enforcement personnel for safekeeping if law enforcement personnel are present when the patient is being placed in an ambulance. (DPFOF ¶ 32.) It is the policy of the Aurora West Allis Hospital that patients being transported in ambulances may not bring weapons in the building. (*Id.* ¶ 34.)

The parties dispute the nature of Pierner-Lytge's statement about going to the hospital, whether she said she would be willing to go to the hospital for medical treatment and speak with a medical professional (DPFOF ¶ 28) or just agreed to the suggestion to speak with someone at the hospital about her stress (Plaintiff's Response to DPFOF, Docket # 25 ¶ 28). Pierner-Lytge was transported by ambulance to Aurora West Allis where she was treated and assessed by medical staff. (DPFOF ¶ 31.) There, Pierner-Lytge spoke with a social worker. (*Id.* ¶ 33.) Because Pierner-Lytge was willing to seek voluntary mental health treatment, a Chapter 51 detention was unnecessary.

Later in the day, Officer Kendall was shown the discharge paperwork. (PPFOF ¶ 30; Defendants' Response to PPFOF, Docket # 20 ¶ 30.) Officer Kendall believed Pierner-Lytge could simply ask for the property back as there was no criminal charge, allegation, or Chapter 51 hold. (PPFOF ¶ 31; Defendants' Response to PPFOF, Docket # 20 ¶ 31.) Officer Kendall verified through the Police Department systems that Pierner-Lytge was not a threat to herself or others after the medical procedure she was transported for. (PPFOF ¶ 32; Defendants' Response to PPFOF, Docket # 20 ¶ 32.) Pierner-Lytge had no orders

against her prohibiting the possession of firearms and was told she could purchase a different one during the time she was denied possession of the firearm. (PPFOF ¶ 35.)

Pierner-Lytge filed a petition for return of property with the Milwaukee County Circuit Court, and on January 18, 2017 the court ordered that the West Allis Police Department return her taser, knife, and holster, but not her firearm. (*Id.* ¶ 36.) The court told Pierner-Lytge she would have to refile in August or September. (*Id.* ¶ 37.) On September 25, 2017, the Milwaukee County Circuit Court held a hearing on Pierner-Lytge's renewed petition for return of her firearm, which the court granted. (*Id.* ¶ 38.) This was the first order to the City of West Allis to return Pierner-Lytge's firearm. (*Id.* ¶ 40.) She received her firearm on September 28, 2017. (*Id.* ¶ 39; PPFOF ¶ 34; Defendants' Response to PPFOF, Docket # 20 ¶ 34.)

    2.    *Further Incidents*

On December 5, 2016, Pierner-Lytge called the West Allis Police Department and West Allis Police officers responded to her address. (DPFOF ¶ 41.) West Allis Police officers transported Pierner-Lytge to Milwaukee County Mental Health so that she could speak with someone. (*Id.*) Pierner-Lytge told West Allis Police officers that she had not slept for three days. (*Id.* ¶ 42.) She told West Allis Police officers she wanted a ride to the Milwaukee County Mental Health Complex. (*Id.*) She also told them that she was on medication for anxiety and bipolar disorder, and had thoughts of harming someone else, but not herself. (*Id.*)

On March 27, 2017, West Allis Police officers were dispatched to 915 South 111th Street because Pierner-Lytge requested that they transport her to Milwaukee County Mental Health. (*Id.* ¶ 43.) She informed West Allis Police officers that she was bipolar and that her

medication was not being effective. (*Id.*) She stated she was having thoughts of cutting her wrists in an attempt to harm herself, but had not yet done so and had no physical injuries. (*Id.*) She also stated she believed she was suffering from sleep deprivation. (*Id.* ¶ 44.) She told officers she had a history of mental health issues and attempts to harm herself, which had been an ongoing issue since she was a child. (*Id.*) She requested to seek voluntary treatment from Milwaukee County Mental Health. (*Id.*) The officers transported her to Milwaukee County Mental Health. (*Id.* ¶ 45.)

  3. *May 26, 2017 Incident*

On May 26, 2017, West Allis Police officers were dispatched to Speedway located at 715 South 108th Street where they encountered Pierner-Lytge. (*Id.* ¶ 46.) She informed West Allis Police officers that she was very depressed and had thoughts of suicide and had for a long time. (*Id.*) She told officers she was dealing with a lot of stress and anxiety. (*Id.*) She told officers she had been involved in an incident with a firearm with a person she considered a friend over the weekend, and that the incident was reported to the City of Waukesha police. (*Id.* ¶ 47.) She informed the officers that she cut herself with a small razor blade as a temporary relief to her stress and depression. (*Id.* ¶ 48.) She also told officers she had access to firearms as she was a security officer, and that the firearm was in the trunk of her vehicle. (*Id.* ¶ 49.) She told officers that she had thoughts of killing herself with her handgun, that she imagined "blowing her brains out," but that she was "too chicken shit to do it." (*Id.* ¶ 50.)

Officer Foy discussed the possibilities with her of seeking mental health help on a voluntary basis, whether at one of the local hospitals or one of the local mental health facilities, and Pierner-Lytge told Officer Foy she was not going to either. (*Id.* ¶ 51.) Officer Foy felt Pierner-Lytge needed mental health assistance, and because Pierner-Lytge wasn't

willing to go voluntarily, Officer Foy detained her and transported her to Milwaukee County Mental Health. (*Id.* ¶ 52, 55.) Pierner-Lytge was placed in the West Allis Police Department's custody on an emergency detention under Chapter 51. (*Id.* ¶ 53, PPFOF ¶ 36.) Pierner-Lytge attempted to get out of the handcuffs, but was unable to do so. (DPFOF ¶ 54.)

West Allis Police officers took possession of the following items from Pierner-Lytge's vehicle: a handgun, ammunition, a lockbox and key, and a folding knife. (*Id.* ¶ 56.) They did so due to Pierner-Lytge's suicidal statements, West Allis Police Department policies 5.1.2 and 7.1.2 regarding search and property retention of detainees, and the policy of Milwaukee County Mental Health that prohibits weapons on its premises. (*Id.* ¶ 57.) The firearm was located in the trunk of the vehicle. (PPFOF ¶ 37.) Pierner-Lytge gave officers her keys for the purpose of giving the keys to her friend to transport the vehicle. (*Id.* ¶ 39.) Before the officers did so, they entered the vehicle and took the firearm and accessories located within the safe. (*Id.* ¶ 40.) They then delivered the keys to Pierner-Lytge's friend so he could transport the vehicle. (*Id.*)

The same day, the City of West Allis Police Department provided Pierner-Lytge with a Petition for Return of Property and required her to petition the court for a property return. (PPFOF ¶ 41, DPFOF ¶ 58.) On July 5, 2017, the Milwaukee County Circuit Court issued an order granting Pierner-Lytge return of her firearm, ammunition, and knife because there had been no allegation of a crime or any Chapter 51 process that prohibited her from possessing the firearm. (PPFOF ¶ 41, DPFOF ¶ 59.) On July 10, 2017, forty-five days after the seizure of the weapons and five days after the court order, the West Allis Police Department returned Pierner-Lytge's firearm, ammunition, and knife to her. (PPFOF ¶ 42, DPFOF ¶ 60.)

*4. West Allis Police Department Policy*

The West Allis Police Department has different policies for returning firearms and returning other types of property. (PPFOF ¶ 6.) A petition for property return is not required to return a firearm in some instances. (*Id.* ¶ 7.) The City Attorney has the authority to determine who will be required to petition the courts for return of property. (*Id.* ¶ 8.) The parties otherwise dispute the nature of the West Allis Police Department policy regarding the seizure and retention of firearms and other weapons. (Defendants' Response to PPFOF, Docket # 20 ¶¶ 5–17.)

**ANALYSIS**

To succeed on a § 1983 claim, Pierner-Lytge must prove (1) the deprivation of a right secured by the Constitution or federal law, and (2) that defendants were acting under color of state law. *Armato v. Grounds*, 766 F.3d 713, 719–20 (7th Cir. 2014) (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)). After reviewing the record in this case and the submissions of the parties, I conclude that, as a matter of law, Pierner-Lytge cannot show that the retention of her weapons deprived her of any right secured by the Second, Fourth, or Eighth Amendment of the Constitution.

*1. Second Amendment*

In her complaint, Pierner-Lytge admits that the defendants never prohibited her from owning or purchasing firearms. (Docket # 1 at 3.) Instead, Pierner-Lytge argues that the defendants imposed a *de facto* ban on her ability to own handguns by repeatedly seizing and temporarily retaining her handguns, which required her to twice purchase new handguns to maintain her employment as a security guard. (*Id.* at 3–4, Docket # 46 at 2.) Pierner-Lytge

claims that she cannot afford to purchase more handguns and is thus now effectively banned from handgun ownership. (*Id.* at 2, 7–8.)

Nothing in the cases Pierner-Lytge cites supports her theory that seizure and temporary retention of individual's firearms can constitute a Second Amendment violation, even if done repeatedly and/or to an indigent individual who requires a firearm for her employment. (*Id.* at 2–6.) Pierner-Lytge relies primarily on *District of Columbia v. Heller*, in which the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms. 554 U.S. 570, 595 (2008). But *Heller* acknowledged that the right is not unlimited and subject to a variety of restrictions. *Id.* at 626. *Heller* itself was extremely narrow: it invalidated a statute banning handguns in the home and a statute prohibiting operable firearms in the home. *Id.* at 628–35. Similarly, *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) held that a law prohibiting the carrying of guns in public violated the Second Amendment. Both *Heller* and *Moore* invalidated actual prohibitions on firearm possession, which Pierner-Lytge admits did not exist in her case. Neither case can plausibly be read to forbid the defendants from seizing and temporarily retaining Pierner-Lytge's firearms in conjunction with the mental health incidents described, or requiring them to take into consideration her financial situation or her need for a firearm in her employment.

As an alternative to the theory of the *de facto* ban, Pierner-Lytge looks to *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011) for the theory that the seizure and retention of a specific firearm could itself constitute a Second Amendment violation. (Docket # 46 at 5.) In *Walters*, the Eighth Circuit stated that "[w]e do not foreclose the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm that he or she otherwise lawfully possessed for self-defense."

12

There are three problems with *Walters*. First, stating that *some* plaintiff *could potentially* show that deprivation of a specific firearm *could* violate the Second Amendment provides no criteria for any such violation. Second, the actual holding of *Walters* was that failure to return a lawfully seized firearm *did not* violate the Second Amendment, because the plaintiff had been able to vindicate his interest by "a meaningful procedural mechanism for return of his lawfully seized firearm" and "[t]he defendants did not prohibit Walters from retaining or acquiring other firearms." 660 F.3d at 317–18. In this case, too, Pierner-Lytge was able to regain possession of her firearms by an apparently adequate procedural mechanism,[3] and the defendants did not prohibit Pierner-Lytge from retaining or acquiring other firearms.

The third problem with *Walters* is that even if it were helpful to Pierner-Lytge—which it is not—it would not be binding. In the Seventh Circuit, it is an open question whether the Second Amendment encompasses the right to possess a specific firearm. In *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571–72 (7th Cir. 2014), the Seventh Circuit declined to address the merits of arguments very similar to Pierner-Lytge's:

> Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention. . . .
>
> This is not an issue that we have addressed and it is not one that we will address here. Beyond a bare-boned contention that the seizure violated her Second Amendment rights, Sutterfield has not developed a cogent argument as to the reach and application of the Second Amendment in the law enforcement and community caretaking context. The issue is a sensitive one, as it implicates not only the individual's right to possess a firearm, but the ability of the police to take appropriate action when they are confronted with a firearm that may or may not be lawfully possessed, and which, irrespective

---

[3] Although Pierner-Lytge expresses due process concerns regarding the application of Wis. Stat. § 968.20(1m)(d) throughout her briefing and also appears to have equal protection objections to the application of the statute, she does not make either claim in her complaint, and I decline to address their merits *sua sponte*.

13

> of the owner's right to possess the firearm, may pose a danger to the owner or others.
>
> We do reiterate that Milwaukee has a procedure by which a citizen whose lawfully-possessed gun has been seized may seek its return. Sutterfield availed herself of that procedure and has not contested its adequacy in this appeal. This too counsels against addressing the merits of Sutterfield's Second Amendment claim.

(internal citations omitted). In light of *Sutterfield*, there is simply no Seventh Circuit precedent for Pierner-Lytge's position that she had a Second Amendment right to possession of the specific firearm or firearms seized by the West Allis Police Department.

Furthermore, even if Pierner-Lytge did have a Second Amendment right to possession of a specific firearm, the defendants would be entitled to qualified immunity because the right was not clearly established. *See Brown v. Zydek*, No. 15 C 1044, 2016 WL 4366592, at *4 (N.D. Ill. Aug. 16, 2016). The defendants did not brief the issue of qualified immunity, but they raised it as an affirmative defense in their answer. (Docket # 7 at 15.) At the hearing, I emphasized the need for the plaintiff to provide authority for clearly established federal constitutional rights she believes were violated and asked the parties to explain in their briefing the implications for a § 1983 claim when the law was not clearly established. *Sutterfield* observed that the issue of whether the Second Amendment protects an individual's right to possess a particular gun is "just beginning to receive judicial attention," 751 F.3d at 571, and Pierner-Lytge was unable to produce a single controlling case that would have put defendants on notice that it could be unconstitutional to seize or retain one or all of Pierner-Lytge's firearms. Thus, even if Pierner-Lytge had a cognizable Second Amendment claim—and she does not—the right she alleges defendants violated was not a clearly established one.

In sum, the defendants' actions do not constitute a violation of Pierner-Lytge's Second Amendment rights, and even if they did, the defendants would be entitled to qualified immunity. Therefore, summary judgment for the defendants is appropriate under Rule 56(f).

*2. Fourth Amendment*

Pierner-Lytge concedes that the initial seizure of her property did not violate the Fourth Amendment, but argues that the continued retention of her property constitutes an unreasonable seizure that violates the Fourth Amendment. (Docket # 46 at 9–16.) At the hearing, I asked counsel for Pierner-Lytge to provide specific legal authority for the claim that retention of property, distinct from the initial seizure, can constitute a separate Fourth Amendment violation.

Pierner-Lytge provides a general survey of Fourth Amendment principles and then points to Wis. Stat. § 968.25, which requires that law enforcement return lawfully possessed weapons to individuals suspected of crimes after questioning. (*Id.* at 11.) Wisconsin statutes are not sources of federal constitutional law and cannot serve as the foundation for a Fourth Amendment claim. Pierner-Lytge comes a bit closer with *Andreson v. Maryland*, 427 U.S. 463, 482 n.11 (1976) (prosecution was correct to return unlawfully seized documents); *United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014) (officials executing warrant for particular data were not authorized to seize and indefinitely retain every file on computer); and *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (district court did not abuse discretion in ordering government to return wrongfully seized evidence). However, these cases are largely inapposite, and nothing in them stands for the proposition that

continued retention of lawfully seized property may constitute a Fourth Amendment violation.

Surprisingly, neither party addresses *Lee v. City of Chicago*, in which the Seventh Circuit squarely rejected Pierner-Lytge's theory that continued retention of lawfully seized property violates the Fourth Amendment. 330 F.3d 456 (2003). After the plaintiff in *Lee* was struck by stray gunfire while driving, authorities impounded his car for evidentiary purposes. *Id.* at 458–59. Authorities then refused to return his car unless he paid towing and storage fees or requested a hearing. *Id.* at 459. Lee conceded that the original seizure of the car was lawful, but argued that the continued retention of his car after authorities had concluded their search constituted an additional "seizure" within the meaning of the Fourth Amendment. *Id.* at 460. Alternatively, he argued that the otherwise reasonable seizure of his car became unreasonable when the government's law-enforcement interest in his car ceased. *Id.* The basis for either theory was that "the continued possession of the property by the government became a meaningful interference with his possessory interest and, thus, must be interpreted as a Fourth Amendment seizure." *Id.* After extensive analysis, the Seventh Circuit rejected Lee's arguments:

> In sum, we conclude, as did the Sixth Circuit in [*Fox v. Van Oosterum*, 176 F.3d 342 (6th Cir. 1999)], that [*Soldal v. Cook County*, 506 U.S. 56, 61, (1992)]'s "meaningful interference with a possessory interest" definition is limited to an individual's interest in retaining his property. Once an individual has been meaningfully dispossessed, the seizure of the property is complete, and once justified by probable cause, that seizure is reasonable. The amendment then cannot be invoked by the dispossessed owner to regain his property. Therefore, Lee's car was seized when it was impounded. The car's subsequent search was completed after ten days. Conditioning the car's release upon payment of towing and storage fees after the search was completed neither continued the initial seizure nor began another.

*Id.* at 466. The Seventh Circuit in *Lee* explained that seized property that is no longer needed should be returned to its rightful owner, but this is guaranteed by the Due Process Clause, not by the Fourth Amendment. *Id.* at 465. *See also Bell v. City of Chicago*, 835 F.3d 736, 741 (7th Cir. 2016) (Fourteenth Amendment, not Fourth Amendment, provided appropriate basis to challenge post-seizure procedures for retrieval of property). Put simply, *Lee* forecloses Pierner-Lytge's claim. *See Gonzalez v. Village of West Milwaukee*, 671 F.3d 649, 660 (7th Cir. 2012) (delay in return of handguns after initial seizure not separately actionable as a Fourth Amendment violation under *Lee*).

Also in the context of the Fourth Amendment claim, the parties spar over whether Pierner-Lytge has provided sufficient evidence for a *Monell* claim. (Docket # 47 at 7–8, Docket # 48 at 4–6.) However, where, as here, there is no underlying constitutional violation, there can be no *Monell* liability. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010).

The actions of defendants did not violate the Fourth Amendment as a matter of law. Therefore, summary judgment for the defendants is appropriate under Rule 56(f).

3. *Eighth Amendment*

Pierner-Lytge raises an Excessive Fines Clause claim under the Eighth Amendment. At the hearing, I asked counsel for Pierner-Lytge to provide federal case law supporting the argument that the retention of Pierner-Lytge's property constituted an excessive fine. I explained that I must be able to instruct the jury based on sound federal legal authority that the type of conduct alleged, if true, constitutes an Eighth Amendment violation.

Pierner-Lytge argues without citation to any legal authority that defendants imposed numerous "functional fines" on her. Pierner-Lytge mentions only one case, *Austin v. United*

*States*, 509 U.S. 602, 609–10 (1993), with no discussion of how it applies to her case. In fact, *Austin* forecloses Pierner-Lytge's argument. In *Austin*, the Supreme Court stated that the Excessive Fines Clause applies only to forfeitures that are intended as punishment for an offense. 509 U.S at 609–10 (the purpose of the Eighth Amendment "was to limit the government's power to punish" and the Excessive Fines Clause limits the government's power to extract payments "as punishment for some offense") (citing *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266–67, 275 (1989)). Pierner-Lytge has alleged no facts and provided no evidence suggesting that the defendants seized or retained her property to punish her for any offense. Pierner-Lytge admits she was never charged with any crime or accused of any offense. (Docket # 1 ¶¶ 98, 104, 109.) On the contrary, it is undisputed that her property was seized for safekeeping and because the institutions to which police transported her did not allow weapons. As for the additional retention of the property, Pierner-Lytge alleges that the defendants retained her property due to concerns about her mental illness. (PPFOF ¶ 16; Docket # 1 ¶¶ 113–114, Docket # 16 at 21–22.) As Pierner-Lytge acknowledges, mental illness is not an offense (Docket # 1 ¶ 104), so the temporary retention of her property cannot have been punishment for any offense.

Finally, Pierner-Lytge argues against summary judgment on the basis that whether the retention of her property constituted a fine or forfeiture is a question of fact for a jury. (Docket # 48 at 7.) Parsing questions of law and fact is a nuanced exercise and largely unnecessary for our purposes here. *See generally* Stephen A. Weiner, *The Civil Jury Trial and the Law-Fact Distinction*, 54 Calif. L. Rev. 1867 (1966). It is beyond controversy that it is the role of the judge to instruct the jury on the definition of legal terms like "fine" and "forfeiture," which in this case must include some element of punishment for an offense.

Properly instructed, no rational jury could find that the defendants imposed a fine or forfeiture on Pierner-Lytge because the undisputed facts establish that the property was not seized as punishment for any offense.

Because defendants' actions as alleged by Pierner-Lytge could not constitute a violation of the Eighth Amendment as a matter of law, summary judgment in favor of the defendants is appropriate on this claim under Rule 56(f).

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that summary judgment shall be entered for the defendants. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of August, 2019.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge